Next case we'll hear is Robinson v. Priority Automotive. And Ms. Brown, I guess we'll hear from you first, right? That is correct. Good morning. Still morning. Good morning, Your Honors. Is it morning? Yes, ma'am. It's still good morning. It is still good morning. May it please the Court, my name is Alicia Brown, and I represent the appellants and plaintiffs, appellants, plaintiffs in this matter. Your Honor, this is a case where we believe the lower court misapplied the Rule 56 standard and ultimately weighed the evidence that was brought before the court as opposed to determining whether or not there was a material issue of fact in dispute. And so we're here today, one, because the lower court resolved those material issues of fact that should have, in fact, been resolved by a jury, and two, because the lower court did not view the facts in a light most favorable to the appellants as the non-moving parties. I know Your Honors are very familiar with the facts of this particular case, and I typically would not go into the facts of the case. However, I think going along with our argument that the lower court resolved the issues of fact, I think reviewing the factual and procedural background that's actually noted in the court's order dated July 8, 2021, is very helpful for the court in understanding how the judge or the lower court misapplied the Rule 56 standard in this case. First, Your Honor, one of the things noted by the court on the second page of the order is that during his brief introductory comments, Mr. Beckley, who is the general manager that is being complained of at this car dealership, instructed all existing priority employees to continue performing their same job duties. This is an important fact that was included inside of the lower court's order, but this is not any fact that was offered by my clients or by any of the affidavits or declarations that were submitted by my clients. And it also states that Mr. Robinson, one of the appellants, did not personally meet Mr. Beckley or receive individual instructions from him. We believe that the judge or the court in this particular case came to that factual finding when my clients presented several, a plethora of evidence that demonstrates that that is not what in fact occurred. If you take a look at the record, there are a number of, there's a lot of evidence that demonstrates that my clients tried to meet with Mr. Beckley, who was the general manager, to determine what their position would be since he had taken over. Wait, I just want to make sure I understand your argument. Because you said the lower court magistrate judge said that there was no meeting, and then you respond by saying there's evidence that my clients tried to meet, which doesn't put into issue the fact that there was no meeting, right? I mean, you can try to have a meeting. I can try to do lots of things. But the question of whether I did them is like a separate question, right? Sure. So just by way of background, and thank you for that, Your Honor, when Mr. Beckley came in as general manager, there was a meeting held with the entire store. As my clients, who were sales managers, when he came on, were trying to continue to engage in their activity as sales managers, there were salesmen telling them, oh, Beckley told us not to bring any deals to you any longer. So when my clients are receiving this message from the salesmen, they are then trying to communicate directly with Mr. Beckley to say, hey, what is going on? Are we being demoted from sales managers or not? And Mr. Beckley is refusing to speak with them, shooing them away as they're trying to figure out what is our position. Are we being demoted? Are we still sales managers or are we salesmen at this point? I'm sorry to interrupt, but I just wanted to go back to your first statement, which I thought was not so much about the meeting but about whether or not everyone was going to continue with the jobs they had. In other words, that there was an understanding that he was coming in and everyone was going to keep doing for the time being what they were doing before. Is that what you first asserted? Am I correct? I'm asserting that my clients do not recall that statement ever being made, and that is not evidence that was presented by my clients. Right. And then it moved into your clients wanted to meet with Mr. Beckley in those first days but didn't end up having the opportunity to do so, either because Mr. Beckley was too busy or because he refused to. Is that right? Because he refused to. That is correct, Your Honor. But again, as Judge Richardson said, are those things necessarily in conflict? In other words, is the fact that everyone continued to do the same job not possible and consistent with the two of them not having that direct or personal communication but it being factually accurate that everyone was expected to do the same job? It is inconsistent, Your Honor, because when my—so if he did make the statement, we're arguing he didn't, but if he did make the statement that all folks should continue on working their jobs or in their positions, and if my clients were to try to do that, the evidence that we've presented, not only from the appellants but also from a number of employees who work there, was that they were told, that the employees were told, that they could no longer take the sales to the appellants in order to close out the sales as sales managers. So the issue is how can you say, oh, continue on being sales managers for all of the sales managers, but yet you're telling the salesmen not to take any of the sales to the managers to finalize those deals, which is the primary function and duties and responsibility of the sales managers. Just so I want to be sure that I look at the record and I look at the right places, I just want to be clear of this, continue with their jobs, you say that evidence didn't come from my clients, and then there's some reference to my clients don't recall that, which is not to say it didn't happen, it's just that they don't have an independent recollection one way or the other, but where am I looking in the record to see where your evidence puts at issue whether that statement, continue with their jobs, or the effect of that statement was made? Sure. You see what I'm saying? Like that's the finding. I want to see what in the record you want me to look at to suggest that that didn't happen, or that there's a dispute of fact about that question. Yes, Your Honor. If you look at the declaration of Quentin Alston, it is on page 1124 of the record, paragraphs 7 through 9. He is specifically stating that he was told by Mr. Beckley not to take any sales, only as it pertained to the appellants in this case. Right, but that doesn't undermine the allegation or the factual finding or the fact, undisputed fact, as the magistrate judge found, that everyone was told that they would continue with their jobs. I think what undermines that fact is even if we were to assume that that fact were true. Okay, but, all right, do you have anything in the record you want me to look at to suggest that that statement wasn't made? No, Your Honor. Okay, all right. I understand now. I'm sorry, I misunderstood. I thought you were saying that there was no evidence that that statement was made or that that was a disputed fact. That's not disputed. What you're saying is, yes, they were told to continue their jobs, but their jobs were undermined by the statement that some salesmen were not permitted to take sales to your clients. That is correct. I understood that argument. I thought you were making a different one. My apologies, Your Honor. And there are a number of different factual statements that are made in the actual order by the lower court that are actually incorrect. For instance, the judge found that plaintiffs alleged that several items from their desks had been missing following the reorganization of the sales floor. And what's important is that the court found that the plaintiffs did not recover any of the missing items, and there is no evidence that they made any attempt to do so. That is absolutely contrary to the evidence that was introduced by my clients in this case. Not only did they testify that their belongings had been thrown away, but there is testimony on pages 839, 901, and 925 of the record that clearly demonstrate that my clients were actively trying to locate their items that were randomly thrown away by Mr. Beckley when he became general manager, and they were told that the items were out in the dumpster, and that they could go out and get them. Now, obviously, no one's going to climb into a dumpster outside, but I do believe it's... Well, it depends on what it is, right? I mean, I'd climb into a dumpster for something, right? I mean, I've got a bunch of little girls. If somebody threw one in, I'd go in after. I would go after. You know, like, I've got a nice enough watch. Somebody threw it in. I don't have nice watches, but if I did and somebody threw it in, I'd go in after it. Right? I mean, that might be unpleasant, but... I think it would be for a reasonable jury to decide whether or not, you know, if there was an actual effort on behalf of my clients to actually go and retrieve, And so the point of me stating that, Your Honor, is the lower court is saying there is no evidence that there was any attempt for my clients to do this when there's actually very clear evidence to the contrary that they did make attempts to do this, and they were told that it was thrown in the garbage by Beckley and that they could go out and fetch it out of the dumpster if they liked to do so. What's even more shocking about some of the factual findings by the lower court, and again, the biggest thing, and I'm going to wrap this part up in a second, but the major thing is the lower court has made these factual findings, and they have weighed the evidence, and we believe that under the circumstances where a Rule 56 motion was filed, that that is improper. And it's stated in the factual findings by the lower court, there is no evidence that Beckley specifically instructed other employees to cease dealing with plaintiffs. That is absolutely not true, and contrary to the facts that are offered by my clients. And again, Let me ask you something. I thought you were going to get a little bit more to the relevant facts. It seems to me what this record shows is that Mr. Beckley came down on short notice from another dealership owned by the same owner to fix this one up, and he came down and found it in pretty sad shape. Boxes were around. Sales were being conducted remotely, and he wanted to change the location of sales. He wanted to clean the place up. He wanted to shape it up, and he was going around treating people roughly and coarsely, and during the course of all of this, you complain about a reference to a group that contained African Americans or blacks as thugs, and that during the sales meeting, he says, let's make priority great again. The only other statement that I saw implicating Title VII was being on the right side as opposed to the white side, but that turns out to be about triple, quadruple hearsay, and the person who said it actually denies that. We don't really need to resolve that because that wasn't direct, and he didn't even hear it. He was told it remotely. So we really are focusing on the fact that Beckley, and he explained he probably used the wrong words, thugs and make America great, and he says he didn't know that offended, but he agrees he could have used some other phrase because your clients thought make America great again was a racist, and that therefore make priority great again would be racist. That's the case, and so the question is regardless of who struck John and whether he was demoted or whether he was not demoted, there was a lot of confusion. Beckley brought down some of his own people. He was going to install them in some places, and he was trying to shape the whole thing up, and there was a little bit of a rebellion by your clients. They didn't want to move where their sales position was, but that's not an issue. None of these things are really an issue. The issue is whether all of this conduct was racially driven sufficient to satisfy Title VII, and I thought that's really where we're at in this case, isn't it? That is, Your Honor, and I want to note that as it pertains to determining whether or not a reasonable jury can find that the conduct was racially driven, this court has held that the circumstances that the evidence has to be— We have to find a severe and pervasive atmosphere and that decisions were made based on race and that type of thing. You allege a demotion because sales weren't being brought to him. That was a de facto demotion, I guess, because they weren't approving sales as sales managers would. Well, Your Honor, I want to note for the court the importance of the totality of the circumstances. That's what I'm looking at. That's what I think is the important part, is to look at the whole circumstances of this, what, five-day engagement with Beckley coming down and trying to put the dealership in some kind of order. He was a little bit of a bull in a china shop. I mean, he came down and he romped around, and every time he was called to task on, he says, Well, I'm sorry, I didn't really mean this or that, but the question is we're not talking about whether people were treated fairly or whether he acted appropriately. We're talking about whether there was a Title VII violation. And we—Your Honor, respectfully, I see that my time is winding down. May I answer your question? Okay, yes, Your Honor. Well, first, it is in dispute as to whether or not the store was doing poorly. The previous general manager stated that it wasn't. But I want to note that it's not just simply about the thug comment, right? We know that that's a racial—we know that that's racially motivated because he was only referring to a group of black employees. We also know that Kyle Vasquez— That group actually included a white or two, didn't it? It did not. Just all blacks? It was three black males and it was one Latino male. When Beckley saw him over there, he called him and said, Hey, you probably shouldn't hang out with those thugs or something along those lines. But it's not just the thug comment, Your Honor. It's the fact that Mr. Beckley only told the salesman not to take their sales to the only two black sales managers that were there. And, yes, Beckley brought in his team, but what's important is— The only two that didn't move when Beckley reorganized the space? There was—so my clients didn't just not move. Everything was removed except for my clients' desk areas. And so they have their desk area and then there's this, like, huge open area sales area and then the other sales managers are situated over there with the sales persons while my clients' desks are situated in the front of the dealership where they had previously been situated. And so when you're closing deals, you'll see in the record when you're closing those deals, the salesman will go to the sales managers. Well, if all of the other sales managers are across the dealership and then if also the general manager himself is saying, Hey, don't go to those two sitting over there. Go to the folks over there. And if the only difference between my clients and— If the only difference between— But, again, understanding the totality of the circumstances, the plaintiffs in this case were the only two— I asked the first question and you— That's okay. All right. I'm sorry. You're over time. I think there were two different answers there, but that's okay. You've got some time on rebuttal, I think. Thank you. Okay. Thank you, Ms. Brown. We'll hear further from you. Mr. Tower. May it please the Court, Your Honors. King Tower. And I'm here today with my colleagues, Leah Stiegler and Rebecca Kolag. We are here because the district court correctly decided that the specific facts requirement that the plaintiff was under at the summary judgment stage to come forward and show that a rational trier of fact could return a verdict in this case. And the plaintiff's favor was not met in this case. And, again, as the judge found, the admissible evidence doesn't satisfy this standard. Quite a bit of the evidence that's referred to by appellants in this case is hearsay, and we had discovery in this case, and it's plaintiff's obligation to obtain evidence from the witnesses who claim to have heard from Mr. Beckley, at least. And so we have second and third degree hearsay with regard to things like people being told that they should not take sales to the plaintiffs in this case. But be that as it may. So is your position the statement that we were told not to take sales to these plaintiffs, that that's only hearsay? That's right, because it is presented as employees who allegedly came to the plaintiffs, the plaintiffs are testifying about this, and what these employees are claiming is what they were, in turn, told by another. So there's no evidence in the record of an employee that was told that by Mr. Beckley? The employees themselves, I'm not aware of evidence that anyone directly says, I was told this by Mr. Beckley. Kyle Vasquez did testify that he was told that the sales area is moving to this new tower, and this is where the sales will be conducted from now on in this more open area, which was What is a tower? It's just a large desk, as I understand it. It's just the place where some of the customers were doing service nearby. It was a more open area. And so this tower was sort of the central place where the sales associates and the sales managers could Is it actually a tower? To be honest with you, Your Honor, I'm not sure if it's a tower exactly or just a large desk or counter. But that's my understanding of it. Counsel, I don't mean to put you on the spot, but what about, as your colleague mentioned, JA1124 paragraph 7, which is the declaration of Quentin Alston, who makes reference to Beckley instructing him and the other salesmen to take any deals to new managers that he brought with them. And then the sentence is it was understood that sales were to no longer be taken to Chris and Kenny. Well, and I guess, Your Honor, I think we do acknowledge that that declaration was submitted. I think that there is a dispute, I guess, to the extent we are talking about where it was anyone told by implication not to use the area where Mr. Hall and Mr. Robinson had previously been sitting and that that was to be interpreted as don't take sales to them as individuals anymore. Did you depose Mr. Alston? We did not. And so the only evidence we have that the sales were directed to not be taken to Mr. Hall and Mr. Robinson as individuals comes from their own testimony that they were told this by other individuals, which is inadmissible, of course, in this case. And, Your Honors, there were... Can you help me understand that your colleague was talking a little bit about why it was that these clients, that the plaintiffs here were not, did not move to the quote-unquote tower? And I couldn't tell, in one instance it seemed like they refused and in another instance it seemed like she was saying they were not permitted. Can you talk to me about where I look in the record to see either side of that coin? Right. Well, Your Honor, there was a declaration submitted from Mr. Gathers, who is an African-American sales employee of priority at the time, who testified that the plaintiffs were choosing to apparently remain at these desks where they had been. I'm not familiar with any evidence that they were directed or forbidden from moving to the new area. So I think the testimony from Mr. Gathers in any event was that they were even sitting in their cars or sitting at their former area and were just sort of waiting to see what would happen. And as Judge Niemeyer mentioned, this was a sort of chaotic period where the new general manager was trying to evaluate everyone and whether they are going to stay on the team. And he did tell the employees to just keep doing what you're doing. And the record at 488 is where Mr. Robinson says that he was directly told to keep doing what you're doing. That happens to be close to the record where Mr. Hall, I believe it is, on 486 said, when he's asked, did you make any attempt to try to locate where your belongings were? His answer was no. So you were asking about where that might be in the record as well. So I think Judge Niemeyer is correct that the district court correctly. Let me understand why this is like the tail wagging the dog, right? But on the conversion claim, why does it matter that he made no effort to find the items? I mean, just as a strict conversion question. That's fair, Your Honor. And I think that, you know, had he done so, I guess there may have been some more evidence that these weren't unlawfully taken, that they were just missing. But I think it just goes to show that there's really not even evidence that would support that these items were taken in any sense, rather than just. He's told they're in the trash. Right. I mean, you know, the implication is that someone put them in the trash, right? I mean, maybe he doesn't say someone put them in the trash. But if you say, where's my stuff? It's in the trash. The clear implication is that someone put them in the trash. It is. Of course, that would also be hearsay evidence that the plaintiffs are attempting to rely on. But the fact that the plaintiffs made no effort to determine whether or not that's actually what happened or where these items were, it just goes to show that there's insufficient evidence to pursue their case on that grounds. So what we're left with, Your Honor. Is there any evidence that linked? I suppose it was a general cleanup. I saw there was some criticism about the fact that boxes were lying around and the place was just generally unkempt. So Beckley comes in and tells employees, let's clean this place up. And so some two or three cleanup crew go and start throwing everything away, including the plaintiff's goods. Is that sufficient to hold the dealership responsible for conversion? Well, as I understand it, Your Honor, the plaintiff's evidence that conversion occurred was that they had items on their desk and that they believe that Mr. Beckley himself had stayed late in the evening before and they showed up and these items were gone. And so for that reason, they say this must be conversion. But I'm not sure that is sufficient evidence to hold the dealership responsible in any event. These are missing items. And so there's no reason to impanel a jury to determine whether or not a conversion has taken place if the plaintiffs can't point to specific facts that the jury could rely on to make that finding at trial. Do you agree if we affirmed otherwise on the non-conversion claims, that the district court would then face a question about exercising supplemental jurisdiction over any conversion question? Correct, Your Honor. We'd have to decide whether to remain as you saw this case was originally filed in state court. But in any event, we'd have to decide whether to exercise that jurisdiction. And Your Honor, I think that the comment, alleged comment referred to earlier about make priority great again is clearly not actionable as the district court found. And so at the end of the day, the gatherers call where the plaintiff's claim that a phone call that was played to the sales associates was in some way intended to embarrass the district court. And so the district court found that that was not in any way indicative of any race-based intent or animus on the part of the dealership or Beckley. And so, you know, the testimony that Mr. Vasquez said that Beckley told him not to hang out with those thugs was deemed to be insufficient to be severe or pervasive harassment, creating a hostile work environment. Remember, we're talking about a period of a total of five days before the plaintiffs voluntarily resign. And so they try to assert that this was a constructive discharge. But clearly, under the court standards, this is not going to meet that standard for workplace conditions that are so intolerable that a reasonable person would feel compelled to resign. And so for that reason, there cannot be a constructive discharge nor a hostile work environment claim here. In terms of a demotion, as was discussed with my colleague, the plaintiffs did claim to have been demoted. In fact, they said that they were told they were demoted and then during discovery admitted that that was not actually what happened and that it was more of this, as Your Honor mentioned, sort of de facto. They were experiencing what they felt like were different job duties, I suppose. But the demotion claim also suffers from a lack of an adverse action as well as any lack of any indication that this evaluation process or, I guess, this potential that they might not be managers going forward was based on Beckley's consideration of race. In fact, the undisputed testimony is that Beckley promoted multiple African-American managers, terminated multiple Caucasian managers, all in this exact same time frame as he was evaluating the talents and skills of the staff that he inherited. So the district court, again, correctly found that there was no unlawful demotion as well. There are a variety of negligence claims that have been advanced. Those that involve inherently intentional conduct, Your Honors, those fail in terms of trying to recapitulate as either general negligence or negligent infliction of emotional distress. The intentional infliction of emotional distress counts also fail as the conduct here does not meet the standard for extreme and outrageous conduct, and the distress element is also not met there. And so the last count, in addition to the conversion and trespass to chattels, would be the negligent hiring, supervision, and so on, retention. Again, there's no evidence that Priority knew or should have known that Beckley was in some way incompetent, that he would harm or was likely to harm people at the dealership. And so, again, these facts don't support that, and the judge correctly dismissed those claims as well. Your Honor, again, I think in some, the evidence is that the plaintiffs here came in and immediately made a judgment about this new general manager. They did make a complaint, and so in terms of the Farragher and Eller standard, I think we can also say that the plaintiffs failed to take advantage of the remedial measures that the employer had available. They were, investigated these complaints. There was a meeting where Beckley apologized for the Make America or Make Priority Great Again comment and tried to provide what the plaintiffs were looking for in terms of a pay plan. Again, the plaintiffs quit that same day and were not going to allow Priority to remedy the things that they were seeking. So for those reasons, they've also failed on the hostile work environment claim, and the district court correctly found that summary judgment was appropriate. I probably could find this somewhere, but Michael Gadsden, do you know whether he was black or white? I don't, Your Honor. Is that it? I'm told he was black, Mr. Gadsden. Thank you. And so thank you. That's it, Your Honor, and I appreciate your time. All right. Ms. Brown, you have some rebuttal? Yes, Your Honor. With respect to the statement about coming over to the white side, it is noted on page 745 of the record that one of the plaintiffs, Mr. Christopher Hall, heard that statement. That's the first thing. The second thing is the call that was made or the call that was played by both – That's a little unfair because if you trace it down as to who said it, who he heard it from, and who he – in other words, it went about three levels, and the person that it's imputed to denied making that statement. Your Honor, my client testified under oath that he heard the other white employee state come over to the white side. He's not saying that somebody told him it was said. It is noted in the record that he heard the statement himself, and that's on page 745 of the record. Who spoke it? The – are you asking who actually made the statement? Yeah, you said your client heard it. Mm-hmm. From whom? So if we take a look at page 745. That's 745? That's correct, Your Honor. In the record, the question was, is it also true that you yourself heard the statement regarding getting on the white side? And Mr. Hall stated yes. But who was the employee who allegedly said the white side? So the name of the employee who made that statement was Lawley. I don't have the last name, but that person's name is in the record, I believe. And, again, my client stated that he heard that statement being made. But did he hear it? The question is, like, did he hear it? Did he hear somebody else say? I mean, what I can't figure out from that is, like, is that him saying, I heard this statement from the person who said it was said or from – right? Did he hear – what it doesn't say is, did I hear it directly or did I hear it indirectly? Did I hear it through hearsay or did I hear it from the person who made the affirmative comment? And so he's just saying, yes, I heard it. But what we don't know from that is whether he himself heard it from the person recounting it or the person who said it. If I may, Your Honor, the question that was posed at his deposition is, is it also true that you yourself heard the statement regarding getting on the white side? And his response was yes. I know, but that doesn't help a thing because the person who told him has to be talked about. You said that was Lawley? Lawley is the person who made the statement, and my client heard what Lawley made the statement. Okay, and was Lawley deposed? Lawley was not deposed in this action. Do we know whether Lawley was reporting that as to what somebody else said or that was Lawley's own statement? I believe it was Lawley's own statement. There's no evidence. The challenge that I've got with that, right, is that that's – this statement is referring to something. The problem is the record that we have doesn't include the prior page of the deposition that describes what this statement is. And so this statement on page 185, presumably, of the deposition, which is not at page 744, this statement, I have no idea what that's referencing. So this statement could be either the direct statement or the indirect statement based on the record that I've got. I've got to interpret what the word this statement means, and since I don't have the record, I don't think I can reach the conclusion that you're asking us to. Sure, and I think ultimately, Your Honor, what I'm trying to get across is that with everything that's happened, with everything that's listed in the complaint – not in the complaint, but in the briefing that we've submitted to Your Honors, through the totality of the circumstances, the question is can a reasonable jury find that with the come-over-to-the-white-side statement? But what is this statement – I can't read this and get anything out of it because I don't know what this statement is referencing. I don't get to take this statement out of context and understand it to mean anything, right? Because I don't have the – I mean, the prior page might – I have no idea what the prior page says, right? Like, I only get the record that you give me, and, like, the record doesn't tell me what this statement is referencing. Sure, Your Honor, in Freeman v. Dow Tau Corp., in 2014, the site is 750 F3D 413. This court held that evidence of how others are treated in the same workplace can be relevant to a hostile work environment claim, and the fact that an employee does not witness statements made to third parties does not bar those statements' considerations when we are evaluating a hostile work environment claim. So regardless if that is interpreted as my client heard it himself or he heard it from another person, we submit to the court that, based on this court's prior decisions, that all of these occurrences should be considered when evaluating the hostile work environment claim. And so, in addition, you know, Beckley refusing to meet with the plaintiffs, throwing their belongings away, calling them and other black employees thugs, telling them – The question is, I understand Hall heard it from Cornelius, right? Mr. Hall has testified that he heard the statement himself, Your Honor. Yes, he said he heard it from Cornelius, that's at 539, and that he was not aware that Cornelius and Richardson had both later stated that Cornelius had said right side, not white. Hall also states in his deposition that a different employee also told him he heard the comment. And then they go trace it down to the person who actually said it, and they said it was the right side. Cornelius did not say that himself. He was repeating what somebody else had said. That is correct, but that doesn't mean that my client didn't hear the statement himself either. He heard it from an employee who was reporting what somebody else said, and somebody else said, I didn't say right, I said white, I said right. And the question now is, is this admissible evidence in a trial? I do believe it's admissible evidence if my client heard it himself, and the person, the deponent who stated it was listed as a witness in this case and could be called to testify. Cornelius was reporting something that was said to him, and that was run down in the depositions. And when they finally got to the person who really said it, said, I said right side, not white side. That's a statement that the employers receive from a current employee, Your Honor, and I think a jury can look at that. And you're trying to suggest that the work environment was hostile because your client heard white side when that was an inaccurate report of what was actually said. Now, that wouldn't be admissible evidence. I think that is a material dispute. In fact, if my client is saying he heard one thing, you know, obviously they can. You can testify that, but that's acceptable. But an employer can have an employee create a statement that says, oh, I didn't actually state that when my client, again, when the facts should be. Oh, this is a hearsay question. In other words, Cornelius was reporting what somebody else had said. And when you get run that down to somebody else, the reason for the hearsay is important because that person misheard because the person who actually made the statement corrected it. Anyway, I understand your point. You say that's factual, but to suggest that that misinterpretation of that created a hostile work environment when the person making the statement talked about something totally different. Well, I think the determination that it was a misinterpretation, again, is an issue of fact. Nobody says disputes what the original person meant. But there's a dispute as to what was said. My client heard what was said. He testified under oath that he heard what was said. I think we've gone pretty far, and we'll cut it off here. But it's a big record. We have to pay attention to all of it, and so we will do that. At this point, we would come down and greet counsel. As you know, our protocols are not following that. But thank you very much for your arguments, and come back again, and we'll shake hands and greet each other appropriately.
judges: Paul V. Niemeyer, Julius N. Richardson, Michael Stefan Nachmanoff